JaWICKER, Judge.
Jefferey Deris (Deris) filed a claim for worker’s compensation with the Louisiana Office of Worker’s Compensation seeking compensation for a work related injury from an accident occurring December 7, 1993 at DHL Airways, Inc. (DHL). Deris was a part-time employee at DHL at the time as well as the sole proprietor of his business known as World Auto. The hearing officer awarded Deris additional compensation based on successive part-time employment. He denied Deris supplemental earnings benefits as well as penalties and attorney’s fees. Deris, DHL, and DHL’s insurer, Hartford Insurance Company (Hartford), appeal. We reverse in part and remand.
Deris appeals specifying the following errors:
1. The hearing officer erred in failing to award supplemental earnings benefits.
2. The hearing officer erred in failing to award penalties and attorney’s fees.
DHL and Hartford appeal specifying the following errors:
1. The court erred in holding that Deris was a part-time employee employed by two or more different employers at the time of his injury.
2. The court erred in holding that Deris, who was a part-time 13employee at DHL at the time of his accident and who was a sole proprietor of his own business named World Auto, was employed by two or more different employers in successive employment as defined in La.R.S. 23:1021(9) and (10)(a)(iv).
3. The court erred in holding that the hours worked per week by Deris as a sole proprietor of World Auto are to be added to the number of hours he worked per week as an employee at DHL in order to compute his weekly worker’s compensation rate.
SUCCESSIVE EMPLOYMENT
DHL and Hartford argue that Deris, who was the sole proprietor of World Auto, is not an employee under La.R.S. 23:1021(9)[1] and (10)(a)(iv).[2] They assert that La.R.S. *569 23:1044[3] precluded Deris from being considered an employee of World Auto since he was not rendering service for another. It is undisputed that Deris was a part-time employee of DHL.
The hearing officer found La.R.S. 23:1035(A)[4] to be controlling. It provides coverage for sole proprietors. Deris testified he had no worker’s compensation at his place of business at the time of the accident. The failure to have worker’s compensation provided to himself in Lhis own business is not dispositive of whether he is entitled to the successive employer benefits. There is nothing in the successive employment statute which requires successive employers to also be covered by worker’s compensation in order for the part-time employee to get the additional benefits. La.R.S. 23:1021(10)(a)(iv)(aa) and (bb). La.R.S. 23:1035 provides that he is not precluded from coming under the act simply because he is a sole proprietor.
DHL and Hartford argue that Deris is not an employee under 23:1044 because he was not rendering service to another. The testimony shows otherwise. Deris testified he functioned as an employee of his business, World Auto, and drew commission checks as draws from the company. These checks were introduced into evidence and show that he was paid by World Auto for his services. The hearing officer correctly concluded Deris was an employee of World Auto.
Deris further testified he was unable to continue working in the business due to his injuries from the work accident. He suffered a loss of earning capacity as a result.
Malone & Johnson, 14 Louisiana Civil Law Treatise (Workers’ Compensation), § 325 at 107 (1994 ed.) opined:
To the employee this loss of earning capacity is everything, and it seems hardly just to point out to him that it is just tough luck that he lost his complete earning capacity at his part-time job.
DHL and Hartford also argue that in order to have the benefit of successive employment Deris must be paid by the hour from his employment with World Auto. They rely on 23:1021(10)(a) for this proposition. However, 23:1021(10) which defines “wages” must be read in its entirety.[5] Sec *570 tion 10 gives more than one method for calculating wages Rother than on an hourly basis. While the provision dealing with successive employment by part-time workers is contained in the category entitled “hourly wages,” the successive employment provision does not require that the employee work on an hourly basis. Instead, it merely gives the basis on which his or her benefits are calculated. It states that the “employee shall be entitled to benefits computed by determining wages under the provisions of this Subsection using his hourly rate in employment at the time of injury and using the total hours worked for all employers of the part-time employee, but not to exceed his average, actual weekly hours worked or forty hours weekly, whichever is less.” The hearing officer calculated the rate accordingly.
Furthermore, “worker’s compensation laws must be given a liberal interpretation.” Morris v. Reve, Inc., 95-310 (La.App. 5th Cir. 10/18/95), 662 So.2d 525; writ denied, 95-3037 (La. 2/16/96), 667 So.2d 1055 at 530.
| ¡¡PENALTIES AND ATTORNEY’S FEES
William Harold Herring, the claims representative, testified he calculated Deris’ compensation rate based only on a wage statement from DHL. He was unaware of any other employment until Deris informed him he was losing money at his other employment as well. He requested verification from Deris but never received documentation of the number of hours worked. He turned the file over to the insurer’s attorney.
Since the issue of whether Deris is entitled to the benefit of successive employment is res nova we find the hearing officer was not manifestly erroneous in denying attorney’s fees[6] and penalties.[7]
We find no error in the hearing officer’s concluding a reasonable controversy existed over whether Deris, as a sole proprietor, was entitled to the benefits of successive employment in computing his wages. Thus, there is no error in his failure to award penalties. We also find no error in the hearing officer’s evidently finding that DHL was not arbitrary and capricious in computing the wages. Accord, Ducharme v. Garland Belongia, 544 So.2d 590 (La.App. 1st Cir.1989), writ not considered, 548 So.2d 315 (La.1989).
SUPPLEMENTAL EARNINGS BENEFITS
The parties stipulated as follows:
*571 1. Deris was injured December 7, 1993 in the course and scope of his employment with DHL.
2. He received compensation in the amount of $137.06 per week based on an average weekly wage with DHL of $205.59 per week. Deris was paid compensation from December 10, 1993 through November 11,1995.
3. Deris was hired as a part-time employee for DHL for two days a week and the average weekly wage was based on an average of 21 hours a week for the 28 days before the accident.
4. Hartford is the compensation insurer.
The hearing officer concluded the vocational expert showed employment was available to Deris within the restrictions presented by his physicians. We find manifest error in that conclusion.
Medical reports were introduced into evidence. On February 27, 1995 Dr. Ralph 17Gessner felt that Deris could return to some type of employment and imposed restrictions on him. However, on April 25, 1995 he stated Deris had not been able to return to work and he wanted an updated M.R.I. After the M.R.I. was done, Dr. Gess-ner reported on May 22, 1995 that Deris continued to have disc herniation and forami-nal encroachment. He felt Deris needed more time for improvement.
On June 20, 1995 Dr. Kenneth Yogel expressed concern about Deris’ ability to maintain gainful employment when he stated, “The patient has agreed to return to the office should his pain become intractable or should he be unable to maintain gainful employment.”
The most recent evaluation was done seven days before trial by Dr. Gordon P. Nutik. Dr. Nutik felt at that time Deris should be capable of light duty work; however, he stated he would send a supplemental report after seeing the latest M.R.I. films and radiologist’s report. No supplement is in the record. Thus, Dr. Nutik’s report is incomplete since it was not based on all of the diagnostic tests.
Both Drs. Vogel and Gessner released Deris to return to work with restrictions; however, both expressed concern about Der-is’ ability to maintain working. Dr. Gessner stated he needed more time for improvement and Dr. Vogel asked Deris to return should he be unable to maintain gainful employment.
Dr. Gessner has recommended further surgery. Deris testified he thought that Dr. Gessner had not discharged him.
Douglas Arthur Keylen, a vocational rehabilitation counselor, testified he met with Deris only once on October 24, 1995. He took a history from him which included an employment history and concluded that Der-is’ prior occupations gave him transferable skills. He was aware of the restrictions imposed by Drs. Gessner and Vogel. Keylen received information from the New Orleans Job Bank regarding jobs in which employers will make reasonable accommodations. He admitted, however, that the willingness to accommodate varies from employer to employer.
From that source he found the following three jobs which he felt Deris could perform based on transferable skills and his medical restrictions: (1) estimator at a body shop, available November 2, 1995 with a salary of $375 per week at an hourly rate of $9.37 per Ishour; (2) administrative assistant requiring typing and clerical duties at $7.54 per hour, and (3) manager trainee doing paperwork, hiring and recruiting at $325 per week at an hourly rate of $8.12 per hour.
Although Keylen discussed the possibility of Deris working as an insurance adjuster, he admitted there were no openings at the time for this position.
On cross examination he admitted that these three jobs were not included in a report sent to Deris’ counsel on November 1, 1995. He also admitted he did not discuss any of these jobs with Deris.
He testified he took Deris’ complaints of pain into account in searching for jobs. He was aware of the medications Deris was taking. Deris told him he would feel light headed and feel that he couldn’t drive at times. He also told him he might feel “loaded.” However, he denied that these symptoms *572 would impair his ability to function at these jobs. He felt that these jobs would not require any heightened level of concentration other than that required when he spoke with Deris. However, he did not know whether Deris was on Vicodin, one of his pain medications, at the time he met with Keylen.
Keylen did not personally speak to the prospective employers. He also did not gather the information on the jobs. He did not personally call these sources and give information about Deris. At the time of trial he could not say whether any of these jobs were still opened.
He stated the job as estimator would not require repetitive bending. He defined repetitive bending to be more than 66⅜% of the time. He did not know if Dr. Gessner meant repetitive bending in this sense. He stated that an estimator would only have to spend a total of 80 seconds an hour bending, stooping and kneeling. He did not consider 80 seconds to be repetitive; however, he gave no basis for this estimate and none of the medical reports defines “repetitive.” He admitted Deris would have to go under a car as an estimator, but stated this would not be repetitive.
He felt Deris could perform the clerical job because Deris told him he took typing courses and had a computer at home. He did not know how many words a minute Deris could type. The job did not specify words per minute. However, he admitted a person would have to have some proficiency in typing.
| ¡)DHL and Hartford assert that in Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989) the Supreme Court did not require the vocational expert to submit the available jobs to the physician for approval. The Dai-gle court explained at 1009:
Once the plaintiff has met his initial burden of proving entitlement to supplemental earnings benefits by establishing his job-related disability, the amount of such benefits must be calculated. 23:1221(3)(a) provides that the benefits are “sixty-six and two-thirds percent of the difference between the average monthly wages at the time of injury and average monthly wages earned or average monthly wages the employee is able to earn.” The next step in the analysis requires an examination of what the employee is earning or is able to earn. The statute further explains this analysis in (3)(c)(i). The most logical interpretation of this provision is that the employer, if he wishes to contend that the employee is earning less than he is able to earn, bears the burden of proving that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer’s community or reasonable geographic region [emphasis added; footnote omitted.]
In Daigle, unlike the instant case, the vocational expert spoke with the physician in order to evaluate the claimant’s job capabilities. Instead of doing so, Keylen made his own assumption as to what Dr. Gessner meant when he said no repetitive bending, stooping or kneeling. He also made his own assumption as to what Dr. Vogel meant when he said no repeated bending. In addition, he had to make his own assumption as to what Dr. Nutik meant when he said no excessive bending.
Furthermore, Keylen did not speak with the prospective employer for the estimator job. Thus, he gave his own assumption as to the specific job requirements. He also did not speak with the prospective employer for the clerical position to determine the level of typing proficiency needed for the job. He did not know Deris’ level of proficiency but assumed he could do this job because he had a computer at home and had taken typing courses.
Keylen also stated that despite Deris’ telling him he had feelings of being “loaded,” “light headed,” and difficulty driving while on pain medication, he did not feel these symptoms would impair his ability to function at these jobs. He felt that Deris showed a sufficient level of concentration the day of his interview, but did not know whether this was a day he did not take any medication. There is no information in the physician’s reports as to the effect of pain medication on his ability to function at work.
*573 110Keylen also could not say at trial whether these jobs were still available. He also never informed Deris or his attorney of their availability.
Also, unlike the expert in Daigle Keylen never contacted the prospective employers to determine whether they would consider hiring Deris.
The testimony and evidence in this case fall short of the Daigle standard.
Additionally, in Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La. 1993) at 55 the court explained:
It is well established that the workers’ compensation act is remedial in nature. In order to effectuate the humane policies it reflects, the law is to be liberally construed in favor of the injured employee. Provisions of the worker’s compensation law should be liberally construed in favor of the claimant.
[[Image here]]
We are unimpressed with the prediction of defendant’s expert that plaintiff could engage in employment as a service station cashier. Our courts should look to the totality of factors related to a realistic appraisal of access to employment.
[[Image here]]
Literacy is of course only one such factor which affects employment opportunities; race, age and the ability to perform may be other factors which affect employment opportunities [citations omitted; emphasis added.]
Keylen did not ask Deris’ physicians about the effect of his medication on his ability to perform. Thus, the hearing officer erred in not considering “the totality of the factors related to a realistic appraisal of access to employment.” Id. at 55. Nor did Keylen determine from the doctors their meaning of repetitive and ask the employers the specific nature of the job. Under these circumstances the hearing officer erred in concluding Deris was not entitled to supplemental earnings benefits.
Although the hearing officer noted Deris had made no concerted effort to find employment, Dr. Nutik only found him capable of light duty work on November 4, 1995, four days before trial. On June 21, 1995 Dr. Vogel expressed uncertainty as to whether Deris could maintain employment.
In Guidry v. Boh Bros. Construction Co., 545 So.2d 538 (La.App. 5th Cir.1989) we used a zero earning capacity where the employer failed to meet its burden. The hearing | nofficer concluded from the stipulations and the uncontroverted evidence that Deris’ average weekly wage at the time of the injury from both employments was $391.60. Under La.R.S. 23:1221(3)(a) the average monthly wages are 4.3 times the average weekly wage. This equals $1683.88. Deris is entitled to sixty-six and two thirds percent of the difference between $1683.88 (average monthly wage at time of injury) and zero (average monthly wage he is currently able to earn). This amount results in $1122.58 monthly supplemental earnings benefits owed from November 11, 1995, the date temporary total disability benefits were terminated, not to exceed a maximum of 520 weeks provided by La.R.S. 23:1221(3) (d).
Should Deris earn more than 90% of his pre-injury wages in any month, he would not be entitled to supplemental earnings benefits for that month. La.R.S. 23:1221(3)(a). There is a possibility Deris could have further surgery. Thus, a reassessment of his disability status may have to be determined.
La.R.S. 23:1202[8] establishes a maximum compensation rate. Thus, Deris’ monthly *574 supplemental earnings benefit must comply with the statutory maximum. Daigle, supra at 1010. There is no evidence in the record as to the maximum weekly compensation rate at the time of Deris’ injury. We must remand. See Daigle, supra.
Accordingly, for the reasons stated, we reverse in part to award supplemental earnings benefits from November 11,1995 until it is shown that a job is available to Deris which he is capable of doing and in which he earns more than 90% of his pre-injury wages in any month. 112This ease is remanded with instructions to the hearing officer to determine the amount of compensation payable in accordance with the views expressed herein. The judgment is affirmed in all other respects. Costs are assessed against DHL and Hartford.
REVERSED IN PART; AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.

. La.R.S.’23:1021(9) defines “part-time employee”:
(9) "Part-time employee" means an employee who as a condition of his hiring knowingly accepts employment that (a) customarily provides for less than forty hours per work week, and (b) that is classified by the employer as a part-time position.

. La.R.S. 23:1021(10)(a)(iv)(aa) and (bb) provide:
(10) “Wages” means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
(a) Hourly wages.
(iv) A part-time employee, as defined in R.S. 23:1021(9) and who is employed by two or more different employers in two or more successive employments, shall be entitled to receive benefits as follows:
(aa) If an employee is employed by two or more different employers in two or more successive employments and the employee incurs a compensable injury under the provisions of this Chapter in one of the employments, the employer in whose service the employee was injured shall pay the benefits due the employee as provided in this Chapter.
(bb) If the employee is a part-time employee in one of the successive employments, is injured in that employment, but as a result of the injury also incurs loss of income from other successive employments, that employee shall be entitled to benefits computed by determining wages under the provisions of this Subsection using his hourly rate in employment at the time of injury and using the total hours worked for all employers of the part-time employee, *569 but not to exceed his average, actual weekly hours worked or forty hours weekly, whichever is less.

. Sec. 1044. Presumption of employee status
A person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter ...

. La.R.S. 23:1035(A) provides:
The provisions of this Chapter shall also apply to every person performing services arising out of and incidental to his employment in the course of his own trade, business, or occupation, ... except that ... a sole proprietor with respect to such sole proprietorship may by written agreement elect not to be covered by the provisions of this Chapter ...

. La.R.S. 23:1021(10) provides:
(10) “Wages" means average weekly wage at the time of the accident. The average weekly wage shall be determined as follows:
(a) Hourly wages.
(i)If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or
(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident; or
(iii) If the employee is paid on an hourly basis and the employee is a part-time employee, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury.
(iv) A part-time employee, as defined in R.S. 23:1021(9) and who is employed by two or more different employers in two or more successive employments, shall be entitled to receive benefits as follows:
(aa) If an employee is employed by two or more different employers in two or more successive employments and the employee incurs a compensable injury under the provisions of this Chapter in one of the employments, the employer in whose service the employee was injured shall pay the benefits due the employee as provided in this Chapter.
(bb) If the employee is a part-time employee in one of the successive employments, is injured in that employment, but as a result of the injury also incurs loss of income from other successive employments, that employee shall be entitled to benefits computed by determin *570 ing wages under the provisions of this Subsection using his hourly rate in employment at the time of injury and using the total hours worked for all employers of the part-time employee, but not to exceed his average, actual weekly hours worked or forty hours weekly, whichever is less.
(v) For an employee in seasonal employment, his annual income divided by fifty-two.
(aa) For purposes of this Subparagraph, seasonal employment shall be any employment customarily operating only during regularly recurring periods of less than forty-four weeks annually.
(bb) If the employee was not engaged in the seasonal employment more than one year prior to the accident, his annual income shall be the average annual income of other employees of the same or most similar class working in the same or most similar employment for the same employer or, in the event that the employee was the only individual engaged in that specific employment, then his annual income shall be the average annual income of other employees of the same or most similar class working for a neighboring employer engaged in the same or similar employment.
(b) Monthly wages. If the employee is paid on a monthly basis, his monthly salary multiplied by twelve then divided by fifty-two.
(c) Annual wages. If the employee is employed at an annual salary, his annual salary divided by fifty-two.
(d) Other wages. If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenly-six week period and multiplied by four; however, if such an employee has worked for the employer for less than a twenty-six week period immediately preceding the accident, his gross. earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by four.

. La.R.S. 23:1201.2

. La.R.S. 23:1201(E)

. La.R.S. 23:1202 provides in part:
[[Image here]]
(2) For injuries occurring on or after July 1, 1983, the maximum weekly compensation to be paid under this Chapter shall be seventy-five percent of the average weekly wage paid in all employment subject to the Louisiana Employ-, ment Security Law, and the minimum compensation for total disability shall be not less than twenty percent of such wage, said maximum and minimum to be computed to the nearest multiple of one dollar. There shall be no minimum compensation for benefits payable pursuant to R.S. 23:1221(3) or (4). In any case where the employee was receiving wages at a rate less than the applicable minimum compensation, the compensation shall be the employee's "wages”. In no event shall monthly Supplemental Earnings Benefits ex *574 ceed four and three tenths times temporary total disability benefits.
B. For the purposes of this Chapter, the average weekly wage in all employment subject to the Louisiana Employment Security Law shall be determined by the administrator of the office of employment security on or before August 1 of each year as of the quarter ending on the immediately preceding March 31 of each year. The average weekly wage so determined shall be applicable for the full period during which compensation is payable when the date of occurrence of injury falls within the twelvemonth period commencing September 1 following the determination.